For the sake of efficiency, I'll call the case since they're consolidated and we've got two case numbers, but take your time in coming up here. We have consolidated case number 14-30060, Berthelot v. United States, with number 14-30316, Albrecht v. U.S. Army Corps of Engineers. So, Mr. Salas. May it please the Court. The plaintiffs do not dispute that the government's initial decision to dredge the Mr. Goh instead of installing foreshore protection, which would have prevented the need for dredging, fell within the discretionary functional exception to the waiver of sovereign immunity. We don't challenge that. We agree that the government had the right to make a decision on which way to go, either dredge or install foreshore protection. Our case, and the issue before this Court, is really whether the subsequent acts taken by the government, and particularly the maintenance, dredging activities that were carried out over many years, are covered by the exception. The law is very clear that acts involving mandatory compliance with federal regulations, statutes, or rules do not satisfy the discretionary functional exception requirement of judgment or choice. And particularly, where a statute or regulation or policy requires the government to act in a certain way, there is no discretion. That's very well established. So in our case, the District Court dismissed the plaintiff's case because the Court believed that in a prior decision issued by this Court, that is the Robinson case, the Court had said that anything that the government did with respect to the Mr. Goh was discretionary. Anything that the government did with the Mr. Goh was discretionary. That's not what this Court said in the Robinson case, and that is not what the law says or allows the government to do. The Mississippi River Gulf Outlet, which is called the Mr. Goh, was built from 1958 to 1968, and it was built as a means of allowing ships to go faster from the Gulf to New Orleans. It is similar to the Houston Ship Channel that allows ships to go directly into the heart of the city. The channel is 40 miles long, or was 40 miles long because it's now closed. And it was originally built to be 36 feet deep, and the sign was to be 650 feet wide on the surface and 500 feet wide at the bottom. Over time, it grew to be over 2,000 feet wide on the surface. Now, what happened is that when this channel was being built back in the 50s, whatever they were digging from the soil to build the channel itself was being deposited next to the channel that was being created. And this soil that was deposited there eventually, over years, became levees that were used to prevent flooding of the city. Now, what happened over the years was that as the surface of the Mr. Goh grew wider and wider, 2,000 feet, it weakened the levees, and it destroyed these wetlands that remained there between the channel itself and the levees, which were really a buffered zone that prevented damage to the levees themselves. Eventually, when Katrina arrived, what happened was that because the surface of the channel was so wide, the waves that were created on the channel itself became more intense and attacked the levees themselves. And also because the wetlands that separated the levees from the channel itself had been destroyed, the attack on the levees was greater because it is acknowledged that wetlands absorb water when there's some type of hurricane or any type of system of that nature. So in our case, we, again, don't say that the government did not have the option of dredging the Mr. Goh over time to keep it navigable, instead of installing foreshore protection, meaning rocks on the side to prevent the salting of the Mr. Goh, which is something that the government had considered over many years to do. The government decided to dredge to keep it navigable, and that is perfectly fine. But what happened is that they used a method of dredging that created the problem that eventually that I have described, and that is a method called box cutting. And what box cutting means is that the dredge, instead of dredging the slopes of the channel as they're supposed to, what they do is they dredge the very bottom, creating a square. And that allows the soil that is above to fall down, and theoretically is supposed to create the slopes. Essentially, they are creating an avalanche on the water that theoretically is supposed to then result in the slopes of the channel being to the same slope to which they were designed. Well, I think we understand that as far as you've explained it in your brief. But what caught me was exactly what statute, policy, or procedure did the Army Corps violate in choosing this type of box cutting? And how did that cause the, you said that caused the damage, but there was exactly the same allegation in Robinson because they didn't put the riprap or whatever it was on the edges of the channel. Did that cause the wave action and the flooding? Well, no. In Robinson, the allegation was that the government should have put the riprap on the sides of the channel. Right. That was the allegation. We agree with that. I understand that. But we don't say that the government did anything wrong by selecting, by electing not to put the riprap. What we are saying is that because they didn't do that and then went to dredge. I understand that. I mean, I'm sorry if I led you on the wrong track. I'm asking you, after reading your brief, I still do not, point me to the statute, the regulation, or the procedure that specifically says do not do box cutting. Well, yes. What the statute said is like you're not supposed to do something that is going to destroy the wetlands. And 33 CFR 1336 states that although the corpse does not process and issue permits for his own activity, they have to do the discharges of dredge or fill material by applying all applicable substantive legal requirements. Then 33 CFR 1336.182 states that Section 307 of the Coastal Zone Management Act requires that the activities of a federal agency be consistent with federally approved estate management plans to the maximum extent applicable. Now, let me back up a little bit here because the Federal Coastal Zone Management Act, when it was adopted by the federal government in 1972, essentially was a way of allowing states to control the activities within the coastal zone. As long as the laws enacted by the states for that purpose were approved by the federal government. In this case, the Louisiana Coastal Zone Management Act was approved by the federal government and the Louisiana government issued certain rules and regulations that are required and must be followed. So . . . Well, I don't understand. You say that you don't have a quarrel with the decision to dredge. That's what the prior case talked about, dredging versus foreshore protection, right? Yes. So now you're okay on dredging? Yes. But in selecting the method of dredging, I take it this box cut dredging is one method, but there are other methods that one could also employ. Isn't that a discretionary function, a discretionary decision that the Army Corps of Engineers made when they chose to do box cut dredging as opposed to some other form? No, because not everything is discretionary. You can say that everything in the world is discretionary because the government can do sharpening a pencil a certain way. There are certain things that it cannot go beyond. The regulations said that they have to do it in a certain way, and that's what I was going to address right now. Louisiana Coastal Use Guidelines, and particularly 1.7, says that uses and activities shall be That is one thing that they have to avoid. The government has to avoid damage to wetlands. Well, where were the wetlands? The wetlands here were what? What remained on either side of the Mr. Goh as it widened? Yes. Well, the- It was eroding wetlands on either side, is that what you're saying? Yes. The Mr. Goh was built on wetlands to begin with, and after the channel was built, it continued to erode all the wetlands on both sides, even going towards the levee itself and going the other way. Because of that erosion of the wetlands, Congress ultimately passed law in 2008 to close the Mr. Goh, and that's why the Mr. Goh is now closed. It's because they wanted to protect the wetlands. The Corps of Engineers acknowledged that the Mr. Goh was causing damage to the wetlands of Louisiana. The Congress took this issue up. They passed the law. They funded- What do you say with the fact in the previous Katrina Canal case that it says, the district court recognized that the design for Mr. Goh expressly contemplated erosion from wave wash and did not provide for armoring the banks. The court held that these design features were shielded by the discretionary function, and the plaintiffs didn't challenge that on appeal. Logically, therefore, and I'm not talking about the armoring, the absence of armoring and the resultant erosion cannot have violated a mandate sufficient to negate the first Berkovitz prong. So if you apply that to the decision on dredging, the district court recognized that there would be erosion. Well, no, yes, and in fact, that's the reason why the district court ruled in favor of the plaintiffs to begin with. And that's the reason why the panel, the Robinson panel, originally ruled in favor of the plaintiffs. But if the government created the design of this with the foreseeability that there would be erosion in the channel and therefore some destruction of wetlands, then they were doing, we have to assume, are we, how can you say that they were not consistent with state law to the maximum extent practicable? In other words, could you build a channel without destroying a few eggs? A few, yes, but not as much as they destroyed. They basically destroyed all of that entire area. I mean, this channel was 500 feet wide, and it grew to over 2,000, four times. And how much of it were they dredging each time? They were dredging 2,000 feet. Well, you know what happened? What really happened is like as it kept growing, they kept growing, getting closer and closer and dredging closer to the new edges. So it was a problem that once it started, they couldn't stop it. They continued to, for the purpose of maintaining the depth of the channel so that ships could go through, they continued to do this dredging that they knew. But unfortunately, or depending on how you look at sovereign immunity, the language to the maximum extent practicable leaves room for discretion about how to accomplish something. And must avoid means that it is understood that not everything will avoid destruction of wetlands. When I read that, I thought, yes, to the maximum extent practicable, I thought that. But there's a regulation that is pointed in our reply brief, which is 15 CFR 930.32, that defines that term, and it says, the term consistent to the maximum extent practicable means fully consistent with the enforceable policies of management programs, unless full consistency is prohibited by existing law. And subparagraph 2 explains that there was no discretion by saying that the act was intended to cause substantive changes in the federal agency decision making within the context of the discretionary powers residing in such agencies. In other words, this statute was specifically intended to take away any kind of discretion that the agencies had pursuant to that language. Well, that's your interpretation. What does that provision of the CFR relate to? That's 15 CFR? 15 CFR section 930.32. Is that in the Environmental Department of the Interior? What's that? I'm looking at it here. In other words, does that refer? It does refer to coastal management. Yes. Okay. Yes. This is where it's specifically directed. I think that the government was really addressing what limits the federal government had with respect to decision making when it came to coastal zone issues. Because the coastal zone issues are of national importance. And the government has realized that these are areas that must be conserved and require a lot of expertise and certain way of dealing with them. Now, it says here that this provision is dated September 18th, 1992. Would that be correct? I don't have the . . . I'm looking at the . . . The statute itself. .       Thank you for that presentation, and I have a sentiment that that preconditions stay there.  here is the whole purpose of it is to highlight why the. . . . . . . . . . Bank still needs to point to language in the coast territorial use guidelines, and that would be a mandatory directive. Coastal use guidelines, 701 that counsel referred to, that any Federal agency is directed to consider when they're determining whether to undergo a federal activity, and so they're precisely the kinds of factors that this Court looked at in the Anderson decision when looking at the Army Corps regulation concerning dredging. And so I think that they've, plaintiffs have failed to point to a mandatory directive here that would distinguish this from this Court's decision in Robinson. And as I think became clear during the argument, the plaintiffs here are, their causal theory is the same as the plaintiffs was in Robinson. They argue that dredging of the Mississauga led to a widening in wetlands destruction that increased Hurricane Katrina storm surge. And this Court . . . Well, all of that is true, of course, from a certain standpoint. And I guess the question is, do they have anything that is more explicit and overcomes the discretionary function? And if they did, then I suppose it would be up to a jury to say X percent of the erosion or whatever was caused by the inappropriate method of dredging, and Y percent was caused by lack of foreshore protection. If we are outside the discretionary function exception, but I don't think they, plaintiffs have pointed to anything. And they bear the burden of stating a facial case for why it doesn't fall within the discretionary function exception, and they really haven't done that here. There's no regulation or guidance or policy that says you can't engage in box cut dredging. They don't even, the regulations and policies that are pointed to don't even talk about the type of dredging at all. So the kinds of regulations and guidance that this Court in the Robinson decision and in Freeman as well and in other decisions has held, you know, are not the sort that bind the agency with a mandatory directive. I'm happy to answer any further questions. Well, they cited a plethora of statutes and regulations. They did, but they all have language like maximum extent practical or to, you know, to the extent to minimize the kinds of sort of generalized precatory language that doesn't provide, prescribe a course of action that the Court had to take with a fixed and easily ascertainable standard, which is what the Supreme Court required in Berkowitz and what this Court's case has required. What's the status of the Butler case in this Court? I'm sorry, I'm not familiar. Well, your brief referred to it. Butler was decided in 1984 and— Oh, sorry, the Butler, yes, I thought it was a recent case, Your Honor, I'm sorry. So those are all pre-Gobert decisions. Gobert reversed a decision of this Court, which had made a distinction between the operational and planning levels for the discretionary function exception, and so all those cases at the plaintiff's site are the same cases at the plaintiff's site in Robinson as well. They're all pre-Gobert decisions where the Supreme Court rejected that kind of distinction between— Well, it's— —design and— Frankly, it's not, I mean, I understand what the Supreme Court did in Gobert, but, which we call Gobert in Texas. I don't know. Oh, that's all right. You wouldn't know, but anyway, I mean, the facts in Butler are so extreme and it looked to me as if it really would have qualified even under Gobert, so that's why I was asking. This Court in Robinson said that where there are sort of scientific or technical errors— Yeah, but the facts in Gobert were that the government had done some dredging near a popular beach off of Gulfport, Mississippi, and that after they did this dredging, it created a trench that was not marked, and over a period of 10 years, about 50 people drowned, and it would be up to three or four people at a stretch every year with regularity, and they would never mark the channel, and then when the locals tried—not the channel, but the hole—and when the locals tried to mark it, the Coast Guard or CORE or whoever it was said, oh, no, you can't do that. That's arduous. I mean, it was truly egregious. That's why I was—you just sort of waved it off in your brief and said, oh, pre-Gobert can't be any good, but I'm not—I'm really dubious about that. Well, I don't think the court needs to decide sort of the status of the Butler case to decide this case, because what we really do have here is a decades-long management of a giant shipping channel and the flood control projects with which it interacted, and so those really are the kinds of decisions that are susceptible to policy analysis, as this court held in Robinson. And we've got the Robinson decision, and I don't think the plaintiffs have done anything to distinguish their claims here. However, the plaintiffs in Robinson talked about—it was a district court held in its decision here. They talked about wetlands lost. They focused on that quite a bit. They talked about the widening of the channel and the decision to dredge. There was expert testimony that the soils in the Mr. Goh were such that there was going to be this massive erosion, you know, regardless of the type of dredging that the CORE would have implemented. So I think plaintiffs are really— Regardless of the dredging or regardless of the existence of foreshore protection or did they say it's sandy soil and it will erode? Well, I mean, they said it's sandy soil and it will erode, and the foreshore protection, you know, addressed that, and that was not until the 80s and 90s. So the district court said, you know, if the foreshore protection had been implemented before the 80s, maybe there would have been—in his view, there would have been a difference in the widening and then ultimately in the storm surge. How many cases are coming along with this bellwether approach? How many more are there? Well, there's 22,000 administrative claims were just denied, but so far we've only seen three additional suits. You only have six months to file, so we should know very shortly. I think most people will take the Robinson decision and maybe not file suit, but we still do have a number of outstanding administrative claims. So we would ask the district court's decision be affirmed. Any other questions? No, ma'am. I guess not. Thank you very much. Okay, Mr. Santos. Okay. Uh-huh. May I please, court? Judge Jones, you touched on this point. The Goldberg decision did not do away with the government's duty to exercise due care whenever they do any type of operations as stated and made clear in the Butler decision. So even if the court were to say that, well, the regulations that I cited to are not applicable or whatever, the government still has a duty to act with due care whenever they do something. And in this case, we allege not only that they violated the regulations, but they also said that they acted negligently and did not follow due care whenever they did the dredging over that period of time. And . . . Did that theory completely swallow the discretionary function exception? I mean, you're always saying that they didn't use due care in those cases. You're saying, you know, you did this or that, and that harmed me. I mean, that's . . . it's a negligence case. The Corps of Engineers didn't deliberately flood the whole city of New Orleans, so of course it's a negligence case. I don't see how that helps you. Well, no. I mean, but when they . . . Due care is negligence. That's what it is. It's the standard of care for negligence. Yes. Okay. Well, the whole point is that there's a discretionary function exception to the general rule of liability. And the general rule of liability is negligence, so I don't understand why you're saying negligence or due care is somehow an exception to the exception. What I'm saying is that the government can elect to do one thing or one method over another. But once they elect to do it, that certain method, they have to exercise due care. And that's exactly what the Butler decision was all about, because there, the government similarly had elected to dredge and then to stop dredging, and over time, people drowned. And the court, this court, found that they had not exercised due care over time, and they had failed to put . . . to post warnings and things of that nature to alert the people who were swimming there that this was a dangerous condition. So Duke Butler controls, I think, this case with respect to one of the two allegations that we've made, that the government acted negligently. And with respect to the other allegations about the statutes themselves, I think one case that it makes very clear and it deals with dredging is a case decided by Judge Clement when she was in the district court, and that's Bean-Horizon v. Tennessee Gas, which we also cited in our brief. There, that case specifically dealt with what regulations a dredging company must follow when they perform those operations. And there, the court dealt specifically with the issue before the court today, whether there was a discretionary exception, and the court said, no, you cannot violate dredging regulations when you dredge, and therefore, at the very least in that case, as I recall, the court sent the case back to develop the facts, which is what happened in our case. Remember, our case got dismissed. We were stayed . . . from the day that we filed our case, we were stayed for six years, and then after the court decided the Robinson case, the court issued an order that all these cases were going to be decided on summary judgment based on the Robinson decision. We didn't get a chance to do any discovery. We didn't get a chance to do anything. No, but you do have the burden of . . . I mean, apparently both sides agree that this went off on a motion to dismiss, or did it go on a motion for summary judgment? Well, I think it went on a motion to dismiss because I don't even think that it could have been possible to go on a summary judgment because even the answers have not been filed. Okay, but then in that case, you have the burden to disprove that it was a discretionary function. Well, no. I cited two or three cases in our brief that the burden to prove a discretionary exception rests on the Federal Government. A trial. A trial. Since we didn't have a trial, it would have to be at this time because they have the burden of proof of the application of a discretionary function exception, especially when we did not get an opportunity to do discovery and do one of the things that we should have been allowed to do at a very minimum, especially when we requested the court give us an opportunity to do some discovery before deciding on this motion. We were given nothing. I think also it's important because it's not just one plaintiff. It's a lot of plaintiffs in this jurisdiction who are never going to get the case heard based on a decision in a case where they were not parties to. Were the plaintiffs in that case elected to go in a different theory of liability than these plaintiffs have elected? We should be at least given a day in court. Even if it gets to a summary judgment, the court may decide at that point and dismiss the case if they don't think that we've proven our case, but to dismiss this at this point, I think it was fair. Thank you. All right. Thank you, sir.